## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATIE DONAHUE-CAVLOVIC, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:15-cv-1649 |
| v. | ) |
| | ) Judge Mark R. Hornak |
| BOROUGH OF BALDWIN, *et al*, | ) |
| | ) |
| Defendants. | ) |

## **OPINION**

### **Mark R. Hornak, United States District Judge**

Plaintiff Katie Donahue-Cavlovic ("Plaintiff"), a patrol officer of nearly fifteen years with the Baldwin Borough (Pennsylvania) Police Department ("Department"), brings this action alleging sex discrimination, sexual harassment, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, codified at 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983 against Baldwin Borough ("Baldwin" or "Borough") and Michael Scott, Chief of the Department ("Chief Scott"). Plaintiff alleges a litany of derogatory, lewd, or offensive comments directed at her or made in her presence over her years in the Department, instances where she was denied training or equal wages, and retaliatory actions taken against her. Defendants Baldwin and Chief Scott move for summary judgment on all four (4) counts of Plaintiff's Complaint. For the reasons that follow, Defendants' Motion for Summary Judgment is granted in its entirety.

### I. **Legal Standard**

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A factual dispute is genuine and material if it "'affects the outcome of the suit under the governing law' and could lead a reasonable jury to return a verdict in favor of the nonmoving party." *Willis v. UPMC*

*Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Initially, the moving party bears the burden of proving that the record presents no genuine dispute of material fact. *Willis*, 808 F.3d at 643. Once that burden has been met, the nonmoving party must set forth specific facts in the record showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986) (quoting Fed. R. Civ. P. 56(e)). If the nonmoving party does not meet this burden, and the record as a whole could not lead a reasonable jury to find for the nonmoving party, the court must enter summary judgment against the nonmoving party. *See Willis*, 808 F.3d at 643. Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

## II. Background

Plaintiff began working as a patrol officer for the Department in 2003, where she remains employed. (ECF No. 33, ¶ 1.)[1] In 2003, Plaintiff commenced a romantic relationship with Lieutenant Craig Cavlovic ("Lieutenant Cavlovic"), who is also employed by the Department, and the two were married in 2005. (*Id.* ¶ 2.) From approximately 2009 or 2010 through 2014, Lieutenant Cavlovic directly supervised Plaintiff, his wife. (*Id.* ¶ 3.)

---

[1] There is only one set of facts in this case. The Western District of Pennsylvania's Local Rule of Civil Procedure 56 requires that a motion for summary judgment contain a concise statement of material facts with citations to the record. W.D. Pa. L. Cv. R. 56(B)(1) (2016). It also requires that that an opposition to a motion for summary judgment include a responsive statement of material facts admitting or denying each fact in the opposing party's statement of facts and the basis for any denials. *Id.* at 56(C)(1). Plaintiff did not comply with this rule. When questioned about this at Oral Argument held on September 7, 2017, Plaintiff's attorney stated the facts in this case were not in dispute, and he agreed with Defendants' statement of facts. Thus, although the Court on summary judgment will draw all inferences in favor of the nonmoving party, for the purposes of this Motion the Court adopts the facts as set forth in Defendants' Concise Statement of Undisputed Material Facts. (ECF No. 33.) *See Dawley v. Erie Indemnity Co.*, 100 F. App'x 877, 881, 881 n.4 (3d Cir. 2004) ("Rule 56 does not oblige a district court to scour the entire record to find a factual dispute. . . . Indeed[,] the Western District of Pennsylvania's Local Rule 56.1 requires a party opposing a motion for summary judgment to cite to the particular part of the record that evidences the existence of an issue of disputed fact."); *Tauro v. Capital One Fin. Corp.*, No. 15-1136, 2016 WL 7404585, at *4 (W.D. Pa. Dec. 22, 2016) (holding that a judge may rely on the facts as plead in the briefings on a motion for summary judgment rather than the entire record).

During her time as an officer with the Department, Plaintiff has filed two separate EEOC charges against the Borough: the first in 2007, and the second in 2015. (*Id.* ¶¶ 4, 7.) It is the second EEOC charge that underlies this case, but a brief discussion of the basis for the first charge is relevant here. After Plaintiff and Lieutenant Cavlovic were married, the Borough required Plaintiff to go on Lieutenant Cavlovic's health insurance plan rather than continue to receive her own benefits. (*Id.* ¶ 4.) Other officers who opted to receive health insurance through their spouse's plan received a reimbursement or "buy back" amount, but Plaintiff did not. (*Id.* ¶¶ 4–5.) Plaintiff first filed a grievance through her union against the Borough in 2006, followed by the sexual discrimination charge with the EEOC in 2007. (*Id.*) The 2006 grievance went through arbitration, and the arbitrator found in Plaintiff's favor. (*Id.* ¶ 5.) The EEOC discrimination charge was resolved by a Release and Settlement Agreement. (*Id.*) The 2007 charge did not include a claim of hostile work environment or sexual harassment. (*Id.* ¶ 6.)

Plaintiff filed the second EEOC charge of sex-based discrimination and retaliation on June 15, 2015. (*Id.* ¶ 7.) The instances of discrimination alleged in this complaint are as follows.

## A.    Disparate Treatment Allegations

To support her disparate treatment action, Plaintiff has alleged various incidents of unequal treatment, denied training, and retaliation. This Section will discuss these incidents in turn.

Plaintiff first alleges she was paid unequal wages in the form of lower healthcare benefit reimbursements. Since January 2010, following the arbitration of Plaintiff's healthcare benefits compensation discussed above, Plaintiff received the "buy back" amount for not participating in the Borough's health insurance plan. (*Id.* ¶ 62.) After Plaintiff had children, her buy back amount was not adjusted to the higher family rate available under the Police Collective Bargaining Agreement. (*Id.* ¶¶ 63–64.) On August 19, 2014, Plaintiff sent a letter to the Borough Manager to

3

ask why male officers with children received a higher healthcare reimbursement amount than she did. (*Id.* ¶ 64.) In response, Plaintiff's healthcare reimbursement amount was adjusted to the family rate in her December 4, 2014, paycheck. (*Id.* ¶ 65.)

Second, Plaintiff claims three instances of denied training between 2011 and 2015. First, in 2011, when Plaintiff was pregnant, she asked to be placed on the child car seat installation detail. (*Id.* ¶ 55.) That request was denied. (*Id.*) Next, in November 2014, Plaintiff and two male police officers requested assignment to the firearms instructor detail and firearms instructor training. (*Id.* ¶ 70.) The firearms training officer did not see a need for any additional firearms instructors and subsequently denied the requests of all three officers. (*Id.*) Lastly, in April 2015, Plaintiff and Officer Brian Henderson requested to attend a patrol rifle proficiency course. (*Id.* ¶ 71.) After Chief Scott informed Plaintiff that the course was a firearms instructor development course, and not a patrol rifle proficiency course, she did not request to attend a patrol rifle proficiency course. (*Id.* ¶¶ 71–72.)

At some point (the date is unclear from the record), Plaintiff was also prohibited from patrolling with Officer Henderson, which she believes was because of her sex. (*Id.* ¶ 56.) Chief Scott informed Lieutenant Cavlovic that it "didn't look right" for Plaintiff and Officer Henderson to patrol together. (*Id.* ¶¶ 60–61.) However, the record reflects that in 2013 continuing through the present, the usual practice within the Borough was for police officers to patrol alone, and Plaintiff has identified no other male officers who patrolled together in the same car. (*Id.* ¶¶ 57–58.)

Plaintiff further alleges she was retaliated against after an incident on July 8, 2014, when Plaintiff delivered packets of information to Borough Councilmembers addressing a possible unfair labor practice in the Borough. (*Id.* ¶ 78.) Plaintiff made this delivery on Officer Henderson's behalf. (*Id.*) On Plaintiff's next work day following this delivery, she and Officer Henderson were

4

called into Chief Scott's office and disciplined. (*Id.* ¶ 79.) Chief Scott threatened to terminate them for violating the chain of command, insubordination, and theft of government property by delivering the papers to the "other side." (*Id.*) A month after this incident, in August 2014, Plaintiff and three other officers were selected for random drug testing. (*Id.* ¶¶ 81, 84.) Plaintiff believes she was selected in retaliation for delivering the packets. (*Id.* ¶ 82.) Borough police officers are selected for drug testing through computer-generated random selections performed by an independent third party, the St. Clair Occupational Health Medicine Center. (*Id.* ¶ 83.) Borough officials have no role in the random selection, other than to receive and deliver notices of the selections to officers. (*Id.*) Plaintiff was also randomly selected for drug testing in August 2015, but does not believe that was a retaliatory selection. (*Id.* ¶ 85.) Plaintiff did not test positive for drugs in either 2014 or 2015. (*Id.* ¶ 86.)

Lastly, in September 2014, Lieutenant Cavlovic informed Plaintiff that Chief Scott had received a complaint from a citizen about her. (*Id.* ¶ 75.) Plaintiff e-mailed Chief Scott and asked to see a copy of the complaint. (*Id.*) Chief Scott responded that the citizen never actually filed a complaint, although Plaintiff suspected that he had encouraged the citizen to do so. (*Id.*) The would-be complainant told Plaintiff that she didn't write a complaint because "what [the citizen] was saying wasn't necessarily true." (*Id.* ¶ 76.)

## B. Sexual Harassment Allegations

In April 2013, Plaintiff learned from Officer Henderson that Officer Collier had said "[Plaintiff] should just tuck her labia between her legs and take the class," referring to an active shooter training course. (*Id.* ¶ 8.) Plaintiff lodged a complaint about the comment in an e-mail to Chief Scott, pursuant to the Department's sexual harassment policy. (*Id.* ¶ 9.) Chief Scott retained

an attorney to conduct an investigation of the incident, and Officer Collier was disciplined. (*Id.* ¶¶ 9–10.)

In the beginning of 2014, a string of incidents occurred within the same week at work, which Plaintiff believes was sexual harassment. (*Id.* ¶ 12.) First, Plaintiff found a condom wrapper on the floor of the backseat of the police vehicle she generally preferred to drive. (*Id.* ¶ 13.) Later that week, Plaintiff found dark, possibly fake blood in the toilet in the police substation's restroom, which she used every day. (*Id.* ¶¶ 20–21.) Finally, Plaintiff found a "wad of napkins" in between the driver's seat and passenger seat of her police vehicle. (*Id.* ¶¶ 27–28.) When she reached in to grab the napkins, Plaintiff realized they were stuck together with blood and long strands of blond hair. (*Id.* ¶ 28.)

The record also reflects three incidents involving Chief Scott that Plaintiff believes constitute sexual harassment. First, at some point in 2013, Chief Scott was wearing a Scottish kilt. (*Id.* ¶ 37.) He commented to Plaintiff that he was "authentic," which she understood to mean he was not wearing any undergarments beneath his kilt.[2] (*Id.* ¶¶ 37–39.) Next, in June 2013, during a discussion in which Plaintiff was present, Chief Scott remarked that a Borough Councilman was "popular with the ladies" because he "has a big d\*\*k." (*Id.* ¶¶ 40–41.) Plaintiff did not want to make a complaint under the sexual harassment policy about the comment because the matter involved Chief Scott. (*Id.* ¶ 43.) The third incident of alleged sexual harassment involving Chief Scott occurred on December 4, 2014, when Chief Scott informed Lieutenant Cavlovic, Plaintiff's husband, about a rumor circulating in Bethel Park (a neighboring community) that Chief Scott and Plaintiff were having an affair together. (*Id.* ¶ 48.) It was apparent to Lieutenant Cavlovic that

---

[2] Plaintiff asserts that Chief Scott volunteered this information. Defendants maintain Chief Scott stated that he was "regimental" in response to a question from Plaintiff about his undergarments. Drawing all inferences in the light most favorable to the nonmoving party, the Court will adopt Plaintiff's version of the events.

6

Chief Scott thought the rumor was ridiculous. (*Id.* ¶ 50.) Plaintiff has no knowledge of Chief Scott repeating the rumor to anyone other than Lieutenant Cavlovic on this one occasion. (*Id.* ¶ 51.)

A fourth incident in the record involves Chief Scott only insofar as he was present when it occurred. In May 2014, Lieutenant Kearns apologized to Lieutenant Cavlovic for a disparaging remark that he made about Plaintiff at a meeting attended by the Mayor, Lieutenant Kearns, and Chief Scott. (*Id.* ¶¶ 45–46.) Kearns stated that he thought Plaintiff and Lieutenant Cavlovic should not work the same shift, and Cavlovic should not be doing his wife's performance reviews. (*Id.* ¶ 46.)

## III. Analysis

Defendants move for summary judgment on all four counts of Plaintiff's claim. For the reasons discussed herein, the Court will grant Defendants' Motion in its entirety.

### A. Count I: Sex Discrimination Under Title VII (Disparate Treatment)

In Count I, Plaintiff alleges sex discrimination in violation of Title VII. Plaintiff claims she has been subject to disparate treatment in the form of unequal wages, lack of detail work, and denied training because of her sex. The Complaint also alleges instances where Plaintiff was unfairly disciplined.[3]

To establish a prima facie case of sex discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for the position in question; (3) she suffered an adverse employment action; and (4) circumstances exist that give rise to an inference of unlawful discrimination in that similarly situated male employees were treated more favorably. *Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 134 (3d Cir. 2011) (citing *Texas Dep't of Cmty.*

---

[3] Count I also includes allegations of a hostile work environment and unfair working conditions. Because these claims are more properly encompassed in a sexual harassment claim (and, indeed, are alleged as such in Count II), rather than a disparate treatment claim, the Court reserves discussion of these allegations for Count II.

*Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006)).

In Pennsylvania, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *Noel v. Boeing Co.*, 622 F.3d 266, 270 (3d Cir. 2010) (citing *Mikula v. Allegheny Cty.*, 583 F.3d 181, 183 (3d Cir. 2009); *see also* 42 U.S.C. § 2000e-5(e)(1)). A claim filed beyond this 300-day lookback period is time-barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Filing deadlines in the context of EEOC charges are strictly construed, and enforcement is not left to a district court judge's discretion. *See id.* at 109. As the Supreme Court has noted, "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* at 108 (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)). "By choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Id.* at 109 (quoting *Mohasco*, 447 U.S. at 825). Therefore, in a sex discrimination claim alleging discrete acts of disparate treatment under Title VII, a party must file a charge within 300 days of the date of the act or lose the ability to recover for it. *Id.* at 109–10.

Each instance of discrimination in a sex discrimination claim constitutes a separate unlawful employment practice, each with its own timely filing deadline. *Id.* at 114. "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* at 112. Thus, in determining whether Plaintiff has produced sufficient evidence to support her claims of sex discrimination under Title VII, this Court may consider only the specific acts in the record that occurred in the 300 days before Plaintiff filed her EEOC charge on June 15, 2015—that is, acts occurring on or after August 15, 2014.

As detailed above, Plaintiff's disparate treatment allegations include (1) unequal wages through lower healthcare benefit distributions; (2) a lack of detail work and denied training vis-à-vis the car seat installation detail, the firearms instructor detail and firearms instructor training, and the patrol rifle proficiency course; and (3) unequal treatment and wrongful discipline.

### 1. Unequal Wages

Plaintiff alleges she was paid unequal wages on the basis of her sex through lower healthcare benefit distributions. Compl. ¶¶ 10–11, ECF No. 1. According to Plaintiff, once she had children, the Borough refused to pay her the higher family reimbursement rate due to her under the Police Collective Bargaining Agreement, although many male officers with children received the family rate. *Id.* The undisputed facts demonstrate that Plaintiff brought this reimbursement issue to the Borough Manager's attention on August 19, 2014, and the problem was resolved in her next reimbursement, which she received in her December 4, 2014, paycheck. ECF No. 33, ¶¶ 64–65. Plaintiff received her last paycheck containing the lower reimbursement rate on December 4, 2013. *Id.* ¶ 66.

This is the only alleged instance of payment of unequal wages in the record, and the discrete act—when Plaintiff received the reimbursement at the lower rate on December 4, 2013—occurred long before the August 15, 2014, lookback period. Thus, the claim is time-barred for the purposes of Plaintiff's Title VII claim of sex discrimination. *See Morgan*, 536 U.S. at 109.

### 2. Lack of Detail Work and Denial of Training

Plaintiff alleges three instances where she received a lack of detail work or was denied training. The first, involving child car seat installation detail, occurred in 2011—years before the 300-day lookback period. Thus, for the same reasons explained above, the car seat installation

9

detail allegation is time-barred for the purposes of Plaintiff's Title VII claims. *See* ECF No. 33, ¶ 55.

The second and third instances (firearms instructor detail and training, and a patrol rifle proficiency course) fare better in this regard, as they occurred in November 2014 and April 2015, respectively—both after August 15, 2014, and within the lookback period. *Id.* ¶¶ 70–71. Despite this, neither allegation is sufficient to establish a prima facie case of sex discrimination under Title VII, for Plaintiff's claims fail to satisfy the third and fourth elements of the test. *See Brown-Baumbach*, 437 F. App'x at 134.

First, regarding the third element, Plaintiff has not established that she was subjected to an adverse employment action as a result of the alleged disparate treatment. *See Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F. Supp. 2d 405, 429–30 (W.D. Pa. 2008). An "adverse employment action" under Title VII is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Id.* at 430 (quoting *Storey v. Burns Int'l. Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). "Adverse employment actions may include demotions, transfers to less desirable positions, and unsatisfactory job evaluations." *Id.* (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993)). Such an adverse employment action, occurring on or after August 15, 2014, would be required to establish Plaintiff's disparate treatment claim. Plaintiff's threadbare allegation in her brief opposing summary judgment that "[w]ith proper discovery, Plaintiff can establish that . . . she was subjected to an adverse employment action" is insufficient to survive a motion to dismiss. Br. Supp. Pl.'s Resp. Defs.' Mot. Summ. J., ECF No. 39, at 7.

Second, the record does not contain sufficient evidence that similarly situated male employees were treated more favorably, as required by the fourth element. *See Brown-Baumbach*,

10

437 F. App'x at 134. In fact, in both instances, the record reflects that similarly situated male officers were treated *exactly the same*. ECF No. 33, ¶¶ 70–72. In November 2014, Plaintiff and two other male officers each requested the firearms instructor detail and firearms instructor training. *Id.* ¶ 70. The requests of all officers were denied. *Id.* Plaintiff has not produced sufficient evidence to give rise to an inference that this denial was made on the basis of her sex, since male officers' requests for the same training were denied in an identical manner.

Similarly, in April 2015, Plaintiff and another male officer requested to attend a patrol rifle proficiency course. *Id.* ¶ 71. Chief Scott denied both officers' requests, because the course was, in fact, a firearms instructor development course (and not a patrol rifle proficiency course), which was not the course Plaintiff was seeking. *Id.* ¶¶ 71–72. As with the second instance of allegedly denied training, Plaintiff fails to demonstrate how these facts could support an inference of sex discrimination.

### 3. Unequal Treatment and Wrongful Discipline

Although Plaintiff does not expressly raise unequal treatment and wrongful discipline under Count I (or any other count), the facts in her Complaint aver to this kind of disparate treatment, which Defendants responded to in their Motion for Summary Judgment as to Count I. Accordingly, the Court will address these allegations here. Plaintiff appears to allege three incidents of unequal treatment on the basis of her sex and wrongful discipline: (1) she was prohibited from patrolling with a male officer; (2) she was threatened with termination for delivering paperwork to the Borough Council; and (3) the Chief told her a citizen was going to file a complaint against her. Similar to the other allegations in Count I, these allegations either occurred prior to the limitations period and are time-barred, or fail to satisfy the elements of a prima facie case of sex discrimination.

11

First, Plaintiff alleges Chief Scott prohibited her from patrolling with Officer Henderson, a male officer, because it "just didn't look right," allegedly referring to the appearance of a male and female officer in the patrol car together. *Id.* ¶¶ 56, 60–61. The date of this incident is unclear from the record; however, even if it occurred within the applicable lookback period, the record is devoid of evidence that similarly situated male officers were treated more favorably. In fact, the undisputed facts show that throughout the lookback period and continuing through the present, the usual practice within the Borough was for police officers to patrol alone, and Plaintiff has identified no other male officers who patrolled together in the same car. *Id.* ¶¶ 57–58. Thus, this incident could not support an inference of sex discrimination based on the facts in the record.

Second, Plaintiff alleges that in July 2014, she was threatened with termination for delivering packets of information addressing a possible unfair labor practice to Borough Councilmembers on behalf of Officer Henderson. *Id.* ¶ 78. Both Plaintiff and Officer Henderson were disciplined for violating the chain of command, insubordination, and theft of government property. *Id.* ¶ 79. Because this alleged wrongful discipline is a discrete act that occurred prior to the lookback period, this incident is time-barred. *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). Additionally, this allegation again involves Plaintiff seemingly being treated identically to a similarly situated male officer, which undermines Plaintiff's argument that she was unfairly disciplined because of her sex. In her brief opposing Defendants' Motion for Summary Judgment, Plaintiff alleges, for the first time, that Officer Henderson was targeted because of his friendship with Plaintiff, and is therefore not a similarly situated male officer to whom Plaintiff can be compared. ECF No. 39, at 8. Putting aside the potential contradiction of this argument, Plaintiff fails to cite to any facts in the record or case law to support these conclusory statements.

Third, in September 2014, Plaintiff was informed that Chief Scott had received a complaint from a citizen about her. ECF No. 33, ¶ 75. Lieutenant Cavlovic had been directed to "verbally counsel" Plaintiff for her handling of the incident with the citizen, even though no formal complaint was actually filed. *Id.* ¶¶ 75–77. Plaintiff fails to explain how this allegation raises an inference of sex discrimination, and has not identified a similarly situated male who was disciplined less severely for comparable conduct. *See, e.g.*, *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011).

Finally, and similarly to her denial of training claims above, Plaintiff has not provided evidence that she was subjected to an adverse employment action as a result of any of these alleged incidents of unequal treatment and wrongful discipline. *See Johnson*, 566 F. Supp. 2d at 429–30. For these reasons, Defendants' Motion for Summary Judgment on Count I will be granted.

## B. Count II: Sexual Harassment (Hostile Work Environment)

Plaintiff further alleges she endured a continuing pattern of sexual harassment and was subjected to a hostile work environment. Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Obergantschnig v. Saw Creek Estates Comm. Ass'n*, No. 12-cv-5911, 2013 WL 5676328, at *4 (E.D. Pa. Oct. 18, 2013) (citing *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). To establish her hostile work environment claim, Plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (2017) (quoting *Mandel*, 706 F.3d at 167). The Supreme Court has "made it clear that conduct must be extreme to amount to a

13

change in the terms and conditions of employment," and that "[t]he standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Obergantschnig*, 2013 WL 5676328, at \*4 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).

In a hostile work environment analysis, courts consider acts of discrimination in aggregation, rather than as discrete acts. *See Morgan*, 536 U.S. at 116. As the Supreme Court concluded, "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* Courts must consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance.'" *Brown-Baumbach*, 437 F. App'x at 133 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

For a hostile work environment claim to be considered timely under Title VII, at least one act must occur within the 300-day limitations period. *Morgan*, 536 U.S. at 117. If at least one act in the pattern is timely, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. . . . [T]he entire time period of the hostile environment may be considered by a court." *Id.* Thus, for Plaintiff's hostile work environment claim to be considered timely, at least one incident comprising the pattern of sexual harassment must have occurred on or after August 15, 2014.

The eight incidents that Plaintiff alleges create a hostile work environment include: Chief Scott's comment to Plaintiff at some point in 2013 that he was "authentic" under his kilt; Officer Collier's comment in April 2013 that Plaintiff "should just tuck her labia between her legs and

14

take the class"; Chief Scott's remark made in Plaintiff's presence in June 2013 that a Borough Councilman was "popular with the ladies" because he "has a big d\*\*k"; the string of incidents involving a condom in the police vehicle, possibly fake blood in the toilet in the police substation, and the bloody wad of napkins in the police vehicle, all of which occurred in the same week in early 2014; Lieutenant Kearns's remark in May 2014 that Plaintiff and her husband, Lieutenant Cavlovic, should not work the same shift and he should not do his wife's performance reviews; and Chief Scott telling Lieutenant Cavlovic in December 2014 about a rumor that he (Chief Scott) and Plaintiff were having an affair.

Most of these allegations are repugnant and all, if true, are unequivocally inappropriate for any workplace, let alone within a police force charged with evenhandedly enforcing the law. Similar to Plaintiff's sex discrimination claim under Count I, however, most of these instances occurred prior to August 15, 2014. Only the rumor allegedly spread by Chief Scott is potentially within Title VII's 300-day lookback period. ECF No. 33, ¶ 37. Thus, for Plaintiff's harassment claim to be timely, this incident must contribute to a pattern of sexual harassment that is sufficiently severe or pervasive to create a hostile work environment. *See, e.g.*, *Moody*, 870 F.3d at 214. If it does, the remaining acts that are part of the same pattern will not be time-barred. *Morgan*, 536 U.S. at 122.

Other courts have considered whether a rumor spread in the workplace constitutes sexual harassment that is sufficiently severe or pervasive "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Moody*, 870 F.3d at 214 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In *Spain v. Gallegos*, the Third Circuit concluded that an untrue rumor that a woman was involved in a sexual relationship with her

15

supervisor, which impugned the integrity of her job performance, could form the basis of a hostile work environment claim under Title VII. 26 F.3d 439, 452–53 (3d Cir. 1994).

This case is different from *Spain* in several crucial respects. First, the factual record in *Spain* demonstrated that the alleged conduct of plaintiff's supervisor both caused and perpetrated the rumors. *Id.* at 442–43. The supervisor would frequently approach the plaintiff in private to demand loans, which led other employees to believe the plaintiff and her supervisor were having an affair. *Id.* at 442. This conduct, and the rumors, continued for years. *Id.* Even after the plaintiff complained about the rumors to her supervisor, the private meetings and loan requests continued, and he did nothing to put an end to the rumors. *Id.* Second, and most importantly, there was clear evidence in the record that the untrue rumors negatively affected the plaintiff in her workplace, ostracized her with her coworkers, and led her supervisors to evaluate her poorly for advancement purposes and deny her a promotion. *Id.* In contrast, in the present case, the rumor surrounding Plaintiff and Chief Scott was allegedly brewing in Bethel Park, not Baldwin. ECF No. 33, ¶ 48. Plaintiff does not allege Chief Scott's conduct caused or perpetrated the rumors (it was clear that Chief Scott expressed that he thought the rumor was ridiculous), beyond the singular instance of Chief Scott telling Plaintiff's husband (Lieutenant Cavlovic) what he had heard. Further, unlike in *Spain*, Plaintiff has produced no evidence that the rumor altered the conditions of her employment, such as by ostracizing her from her colleagues, preventing her from advancing within the department, or otherwise materially impacting her. *Cf. Spain*, 26 F.3d at 451–52. In fact, Plaintiff does not even allege her fellow Baldwin officers knew of the rumor. ECF No. 33, ¶ 51.

To be clear, the repeated incidents of alleged sexual harassment forming Plaintiff's purported pattern give the Court pause. But this Court is not writing on a blank slate, as even if all seven of the alleged instances prior to the rumor episode are considered to fall into one pattern of

16

sexual harassment, the conduct as alleged does not necessarily rise to the level of seriousness or pervasiveness necessary to survive a motion for summary judgment. Here's why. Courts have held plaintiffs to a high standard to satisfy the serious or pervasive requirement.[4] *See, e.g.*, *Obergantschnig*, 2013 WL 5676328, at \*6–8. As to seriousness, "[o]ccasional insults, teasing, or episodic instances of ridicule are not severe enough to permeate the workplace and change the very nature of the plaintiff's employment." *Tourtellotte v. Eli Lilly & Co.*, No. 09-cv-0774, 2013 WL 1628606, at \*5 (E.D. Pa. Apr. 16, 2013), *aff'd*, 636 F. App'x 831 (3d Cir. 2016); *see also Faragher*, 524 U.S. at 788. Regarding pervasiveness, "Third Circuit courts have found sexual, derogatory, or insulting statements to be actionable when they are made on a very frequent and continuous, for example weekly, basis." *Id.* at \*6. In contrast, "statements or rumors made in isolated incidents are not actionable." *Obergantschnig*, 2013 WL 5676328, at \*7 (collecting cases).

Nonetheless, even if the seven time-barred events could be found to be sufficiently serious or pervasive to make out a hostile work environment claim, the rumor-related situation within the lookback period does not, whether considered on its own or in conjunction with those prior episodes. The record does not reveal that Chief Scott instigated or perpetrated the rumor, his single comment about it self-branded it as unfounded, there is no evidence that it persisted within the Department, and there is no evidence that it in any way affected Plaintiff's conditions of

---

[4] Case law is replete with examples of conduct that, although disgusting, has been determined to be insufficiently severe or pervasive in a legal sense to establish a hostile work environment claim. *See, e.g.*, *Obergantschnig*, 2013 WL 5676328, at \*1–2 (conduct not "severe or pervasive" where coworker: rubbed plaintiff's shoulders and asked her out on dates multiple times; stated he could not "do her" now that plaintiff was involved with another man; put his hands around plaintiff's waist and told her she was "too skinny"; called plaintiff a prostitute, slut, and c\*nt; and spread rumors that plaintiff had been "a hooker in New York," had been "railroaded" by every employee, and was having an affair with a former supervisor); *Hill v. Lanier Parking Meter Serv., LLC*, No. 3:09-CV-627-H, 2010 WL 3944725, at \*1 (W.D. Ky. Oct. 6, 2010) (conduct not "severe or pervasive" where supervisor over a twelve-month period: kissed plaintiff during work; made sexually suggestive comments about plaintiff's lack of tan lines and asked if he could watch plaintiff tan in a tanning bed to see how she tanned without getting any tan lines; rubbed plaintiff's shoulders once a week; put his arm around plaintiff; stood immediately behind plaintiff while she was bending over and put his hands on her waist; commented about her pants fitting tightly; and sent plaintiff a number of sexually suggestive electronic instant messages).

employment. Thus, for the reasons noted above, it cannot resurrect what are otherwise untimely hostile work environment claims. As a result, the Court grants summary judgment to Defendants on Count II.

### C. Count III: Sex Discrimination Under 42 U.S.C. § 1983

Plaintiff brings her third Count under 42 U.S.C. § 1983. The Complaint alleges that "Defendants were acting under color of state law when unfairly and unjustly discriminating against Plaintiff Katie Donahue for her gender." Compl., ECF No. 1, ¶ 61. It is unclear whether Plaintiff attempts to assert this claim against the Borough, Chief Scott, or both. The Complaint also does not specify which of Plaintiff's constitutional right(s) Defendants are alleged to have violated, but during Oral Argument, Plaintiff clarified that this Count is intended to be an Equal Protection claim. *See, e.g., Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990). Equal Protection claims under § 1983 require proof of the defendant's intent to discriminate. *Williams v. Pa. State Police Bureau of Liquor Control Enf't*, 108 F. Supp. 2d 460, 471 (E.D. Pa. 2000) ("The *sine qua non* of any successful Equal Protection claim under § 1983 is purposeful discrimination.").

To the extent Plaintiff attempts to assert a § 1983 claim against the Borough, she fails to allege that she was harmed by a municipal custom or policy. A municipality may only be liable under a § 1983 claim if the plaintiff can show the discrimination was the result of a government's policy, custom, or practice, as there is no respondeat superior liability under § 1983. *Jennings-Fowler v. City of Scranton*, 680 F. App'x 112, 118 (3d Cir. 2017) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (superseded by statute on other grounds)). There is no basis advanced by Plaintiff to support such a conclusion here. Accordingly, the Court grants summary judgment on any § 1983 claim against the Borough.

To the extent Plaintiff attempts to bring § 1983 claims against Chief Scott under a theory of supervisory liability or in his individual capacity, these claims require separate consideration. Section 1983 claims have a two-year statute of limitations, which means this claim may encompass discriminatory acts alleged to have occurred on or after December 15, 2013. Under a theory of supervisory liability, Plaintiff must adduce evidence of Chief Scott's "personal direction" or "actual knowledge and acquiescence" of harassment by others, which is simply not in the record before the Court.[5] *See Jennings-Fowler*, 680 F. App'x at 118. The record reflects that Plaintiff only made one complaint of sexual harassment to Chief Scott (regarding Officer Collier's labia comment), to which Chief Scott responded by retaining an attorney to investigate and disciplining Officer Collier. ECF No. 33, ¶¶ 9–10. Thus, Chief Scott's response to that complaint does not support an inference that he acquiesced to harassment by others. As to the other alleged instances of sexual harassment concerning Chief Scott in a supervisory capacity, there is either no evidence Chief Scott knew about the incident (e.g., the instances involving the condom, unflushed toilet, and bloody napkins) or no evidence the incident was, in fact, derogatory (Lieutenant Kearns's comment in the meeting). Thus, the Court grants summary judgment on Plaintiff's § 1983 claim against Chief Scott in his official capacity.

---

[5] Plaintiff has not asserted that Chief Scott would constitute a "policymaker," in which case the Borough could be liable for a government policy or custom established by Chief Scott's course of conduct. *See, e.g., Andrews*, 895 F.2d at 1480 ("[I]t is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom."). Even if Plaintiff intended to do so, however, such an argument would fail based on the record before the Court. As the Third Circuit determined, "the question of who is a 'policymaker' is a question of state law. . . . In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action." (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 142 (1988)). In some cases, courts have held police chiefs to be municipal policymakers. *See, e.g., Keenan v. City of Philadelphia*, 983 F.2d 459, 468–69 (3d Cir. 1992); *Andrews*, 895 F.2d at 1481; *Black v. Stephens*, 62 F.2d 181, 191 (3d Cir. 1981). To make this determination, however, a court must first examine the chief's responsibilities and decision-making authority with respect to the conduct at issue. Unlike in those cases, the evidence in the record is insufficient to meet Plaintiff's burden of proof in this regard. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 264–65 (3d Cir. 2010) (concluding a borough police chief was not liable in his official capacity under § 1983 when plaintiff presented no evidence that the chief was a final policymaker for the borough).

This leaves Plaintiff's § 1983 claim against Chief Scott in his individual capacity. The Complaint includes three instances of alleged sexual harassment personally involving Chief Scott: his alleged statement at some point in 2013 that he is "authentic" beneath his kilt, his comment in June 2013 that a Borough Councilman was "popular with the ladies" because he "has a big d\*\*k," and the rumor incident that occurred in December 2014. Of these, only the kilt comment—if it in fact occurred on or after December 15, 2013—and the rumor incident fall within § 1983's statute of limitations. The June 2013 comment, although fairly seen as sexually derogatory, is time-barred.

Both of these remaining incidents are insufficient to support a claim for Chief Scott's individual liability under § 1983 for two reasons. First, Plaintiff fails to offer proof of Chief Scott's intent to discriminate against her based on her sex, which is the distinguishing factor between claims brought under § 1983 and Title VII. *See Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 435 (W.D. Pa. 2014). Second, lack of proof of purposeful discrimination aside, "hostile work environment and sex discrimination claims . . . under Section 1983 require the same showing as the parallel claims under Title VII." *Thibert v. City of Oregon*, 724 F. Supp. 2d 830, 830–40 (N.D. Ohio 2010); *see also Vay v. Huston*, No. 14-cv-769, 2016 WL 7324596, at \*14 (W.D. Pa. Dec. 16, 2016) ("The elements of a hostile work environment claim under Title VII and § 1983 are the same."). The "authentic" kilt comment, although sexually suggestive and inappropriate for the workplace, is not sufficiently serious or pervasive that it changed the terms and conditions of Plaintiff's employment. Similarly, the rumor incident is not evidence at all of a hostile work environment for the reasons noted above as to her Title VII claim. Thus, for the same reasons these claims fail under the Title VII analysis, they also fail under § 1983.

## D.    Count IV: Retaliation Under Title VII

In her final count, Plaintiff alleges that Defendants retaliated against her in the form of "job assignments, training[,] and drug testing," in violation of Title VII. Title VII's anti-retaliation provision prohibits employer retaliation after an employee opposes an unlawful employment practice or files a Title VII charge. *See* 42 U.S.C. § 2000e-3(a).

In order to establish a prima facie case of retaliation, Plaintiff must show that: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Brown-Baumbach*, 437 F. App'x at 135 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)). Regarding the third element, the Supreme Court concluded that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013). That is, an employee who alleges unlawful retaliation under Title VII must show that the injury would not have occurred but for the act. *Id.* at 2525. This is a different, and higher, causation standard than Title VII requires for discrimination claims based on the employee's status in a protected class, where "[i]t suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* at 2528 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

Plaintiff's Complaint does not specify the protected activity forming the basis of her retaliation claim, although the 2015 EEOC charge underlying this action asserts a claim of retaliation for having complained of sex discrimination in the past. The Concise Statement of Undisputed Material Facts reflects that Plaintiff engaged in conduct protected under Title VII by

21

filing a discrimination charge with the EEOC in 2007 and by lodging a complaint about Officer Collier's "labia" comment in 2013, pursuant to the department's sexual harassment policy. *See* ECF No. 33, ¶¶ 4–5, 8–9. Thus, to succeed on her Title VII retaliation claims, Plaintiff must show that the Borough took an adverse employment action against her after or at the same time as she engaged in these protected acts, and this protected conduct was the but-for cause of the adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Nassar*, 133 S. Ct. at 2529. Further, the retaliatory act must have occurred on or after August 15, 2014, to fall within Title VII's lookback period.

Plaintiff appears to allege three adverse employment actions that may have occurred within the lookback period: (1) denial of training (specifically, the firearms instructor detail and training in November 2014, and the patrol rifle course in March 2015); (2) being prohibited from patrolling with Officer Henderson (the date of which is unclear); and (3) being required to undergo drug testing in November 2014. *See* ECF No. 1, ¶ 65; ECF No. 39, at 8. The Court is not convinced that a reasonable jury could conclude that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington*, 548 U.S. at 68), given that in all three instances, other officers received identical treatment that was not alleged to be retaliatory. But the Court need not analyze this element further, because Plaintiff has failed to put forth any facts or circumstances that would support a causal link between the protected activity and the allegedly retaliatory conduct, particularly in light of the more than one-year period between the 2013 complaint and the alleged retaliatory actions. *See* ECF No. 33, ¶¶ 9, 56, 70–71, 84. Accordingly, the Court concludes

that Plaintiff has failed to adduce sufficient evidence to establish a prima facie Title VII retaliation claim. Defendants' Motion for Summary Judgment on Count IV of the Complaint is granted.

## IV.    Conclusion

For the reasons stated in this Opinion, Defendants' Motion for Summary Judgment will be granted in full as to Plaintiff's Complaint.

An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: October 26, 2017

cc:    All counsel of record